UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

MICHAEL D. CARROLL,                 )
*as the Guardian of the Person*     )
*and Estate of Joshua M. Carroll*,  )
                                    )
        Plaintiff,                  )
                                    )
            v.                      )       No. 4:08-CV-23 JD
                                    )
CALVIN G. KAMPS, *et al.*,          )
                                    )
        Defendants.                 )

<u>OPINION AND ORDER</u>

On March 7, 2008, Plaintiff, Michael D. Carroll ("Carroll"), filed a complaint in this

Court, as the Guardian of the person and estate of Joshua M. Carroll. [DE 1]. On August 11,

2009, Carroll filed an amended complaint. [DE 24]. In his amended complaint, Carroll alleges

that Joshua M. Carroll suffered a severe brain injury when he was negligently struck by a tractor-

trailer, driven by Defendant, Calvin G. Kamps ("Kamps"). *See* DE 24. Carroll alleges that the

truck was owned by Kamps and operated pursuant to the authority bestowed upon Defendant, T

and L Trucking of Michigan ("T&L"). *See* DE 24. Additionally, Carroll alleges that the

attached trailer was owned by Defendant, High Lean Pork, Inc. ("High Lean"). *See* DE 24.

Finally, Carroll alleges that Kamps was an employee of T&L, High Lean, and Defendant, ACN

Enterprises Inc. ("ACN"). *See* DE 24.

On June 3, 2010, this case was reassigned to the undersigned for all further proceedings.

[DE 47]. On September 23, 2010, High Lean filed a motion for summary judgment, asserting

that it was entitled to judgment as a matter of law on the issue of vicarious liability because High

Lean was not Kamps' employer at the time of the accident. [DE 50]. On October 21, 2010,

Carroll filed a cross motion for summary judgment, asserting that he was entitled to judgment as a matter of law on the same issue against High Lean based on federal statutes and regulations.[1] [DE 51]. On the same day, Carroll filed a brief in support of his motion and in opposition to High Lean's motion. [DE 52]. On November 4, 2011, Carroll filed a reply. [DE 53].

## I. Facts

The following are the uncontested facts, taken directly from the parties' briefs and the exhibits attached thereto. High Lean is in the business of raising and selling hogs and pork products. DE 53-3 at 2. Instead of using its own trucks and drivers to deliver and sell its hogs, High Lean uses the trucks and drivers of others. DE 53-3 at 2. However, High Lean contracts to have its hogs shipped in its own trailers. *See e.g.* DE 50-1 at 2. Although High Lean has a United States Department of Transportation ("DOT") number for use of its vehicles used in local transportation, High Lean does not have a ICC/MC permitting number. DE 52-3 at 1, DE 53-3 at 2. In addition, High Lean's DOT number is not displayed on any of its vehicles or trailers. DE 52-3 at 2.

On March 5, 2007, High Lean contracted with T&L and Kamps to transport High Lean's hogs in High Lean's trailers. *See* "Swine Trucking Agreement," DE 50-1 at 2-3. In the parties' one-year, automatically renewing contract, T&L is identified as a motor carrier authorized to provide transportation of goods pursuant to the ICC/MC number 408888.[2] DE 50-1 at 2-3 ¶¶ 2, 13. T&L was not permitted to subcontract its shipment responsibilities without High Lean's

---

[1] Neither of the parties' motions for summary judgment addresses Carroll's claims against Defendants T&L or ACN.

[2] *See also* Carroll's Amended Complaint, DE 24 at 2, wherein Carroll asserts that T&L's DOT number is 955480.

written consent and was restricted to hauling only High Lean's hogs in High Lean's trailers. DE 50-1 at 3 ¶ 9.

Under the terms of the parties' contract, T&L was required to pick up and deliver High Lean's hogs at places and times specified by High Lean. DE 50-1 at 2 ¶ 4. In addition, T&L was required to submit a weekly freight bill to High Lean, specifying the pickup and delivery points of each shipment, the number of hogs shipped, and the details on the number of hogs lost during shipment. DE 50-1 at 2 ¶ 4. Drivers employed to make shipments under the contract were required to provide daily maintenance logs of the High Lean's trailers at High Lean's wash barn. DE 50-1 at 3 ¶ 9. Further, the drivers were required to enroll in a specified quality assurance program. DE 50-1 at 3 ¶ 9. Although the precise schedule of rates is not included as an exhibit, the contract indicates that rates of payments for each shipment were predetermined by the parties; and High Lean's payment to T&L was to be effectuated within ten days of each shipping invoice submitted by T&L. DE 50-1 at 2 ¶¶ 3, 5.

The contract required T&L to obtain insurance for public liability, property damage liability, and cargo liability. DE 50-1 at 2 ¶ 6. The contract specified the amounts of coverage; and it mandated that High Lean be a listed-insured under the policies. DE 50-1 at 2 ¶ 6. The contract indicated that T&L would be held liable for "excessive" losses and damages incurred on account of T&L's negligence. DE 50-1 at 2 ¶ 7. In addition, the contract required T&L to indemnify High Lean for all liability caused by T&L and its agents and employees during shipments. DE 50-1 at 3 ¶ 8.

On October 4, 2007, Kamps made a delivery of High Lean's hogs, driving his own 2003 Peterbilt tractor and pulling a 2002 Wilson trailer, owned by High Lean. DE 52-1 at 2; DE 52-2

at 2.  After Kamps dropped off the shipment of High Lean's hogs at Indiana Packers in Delphi, Indiana, Kamps departed on Highway 421.  DE 52-1 at 4.  While on Highway 421, Kamps noticed Carroll walking along the side of the road about fifty feet ahead of him.  DE 52-1 at 4.  Kamps states that he braked and moved the truck to the left but was unable to avoid hitting Carroll, whom he says walked or stumbled in front of the truck.  DE 52-1 at 4.  As a result of the accident, Carroll suffered broken ribs and vertebrae and sustained a traumatic brain injury.  DE 52-4 at 2.  Further, Carroll sustained numerous medical bills and has not been able to return to work because of his injuries.  DE 52-4 at 2.

## II.  Cross Motions for Summary Judgment

### A.  Standard for Granting Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  "In other words, the record must reveal that no reasonable jury could find for the non-moving party."  *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law."  *Brown v. City of Lafayette*, No. 4:08-CV-69, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986)).

Once the moving party has met this burden, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988). To establish a genuine issue of fact, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, not "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *First Nat'l Bank of Cicero v. Lewco Secs. Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988). "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). If the nonmoving party fails to establish the existence of an essential element on which it bears the burden of proof at trial, summary judgment is proper–even mandated. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex*, 477 U.S. at 322-23) (holding that a failure to prove one essential element "necessarily renders all other facts immaterial")).

In ruling on a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 583 (7th Cir. 1994). A court must avoid the temptation to "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment

is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the court's sole task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770; *Waldridge*, 24 F.3d at 920. If a reasonable factfinder could find in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

## B. Analysis of Carroll's Motion for Summary Judgment [DE 51].

In Carroll's motion for summary judgment, Carroll exclusively argues that Kamps was High Lean's employee, based upon a theory of statutory liability under the federal trucking regulations involving leases.

Tort liability may be imposed on an employer for the torts of his agent, when the employer controls or has the right to control the physical conduct of his agent in the performance of a service.[3] *Guaranty Nat'l Ins. Co. v. Dallas Moser Transporters, Inc.*, 596 N.E.2d 966, 969 (Ind. App. 1992) (citing *Trinity Lutheran Church, Inc. v. Miller*, 451 N.E.2d 1099, 1101-02 (Ind. App. 1983)). In contrast, an employer of an independent contractor, one who controls the method and details of his own task, is generally not held liable for the torts of the independent contractor. *Ill. Bulk Carrier, Inc. v. Jackson*, 908 N.E.2d 248, 254 (Ind. App. 2009); *Guaranty Nat'l Ins. Co.*, 596 N.E.2d at 969; *Dallas Moser Transporters, Inc. v. Ensign*, 594 N.E.2d 454, 457 (Ind. App. 1992).

Under Federal Motor Carrier Safety Administration ("FMCSA") regulations, however,

---

[3] While neither party specifies whether Indiana law is applicable to the issues underlying this case, both parties cite Indiana substantive law to argue their competing theories of vicarious liability. As such, the Court also applies Indiana substantive law when analyzing the parties' cross motions for summary judgment.

this distinction between employees and independent contractors has been eliminated for motor

carriers operating pursuant to equipment lease agreements. *Ill. Bulk Carrier, Inc.*, 908 N.E.2d at

255; *Detrick v. Midwest Pipe & Steel, Inc.*, 598 N.E.2d 1074, 1080 (Ind. App. 1992); *Guaranty*

*Nat'l Ins. Co.*, 596 N.E.2d at 969; *Rediehs Express Inc. v. Maple*, 491 N.E.2d 1006, 1011 (Ind.

App. 1986). Under lease arrangements governed by the regulations, liability is fixed as a matter

of law upon the carrier owning operating authority.[4] *Rediehs Express Inc.,* 491 N.E.2d at 1011.

Specifically, where a leased vehicle is involved in an accident during the term of the lease while

carrying the Interstate Commerce Commission number[5] ("ICC/MC number") of the common

carrier with operating authority, the carrier is liable as a matter of law.[6] *Detrick*, 598 N.E.2d at

---

[4] The primary objectives of the regulations were to provide for the enforcement of safety responsibility, to insure adequate insurance coverage, and to eliminate the difficulty of injured plaintiffs in determining who controlled a leased vehicle. *Rediehs Express Inc.,* 491 N.E.2d at 1011. When entering into a lease arrangement and placing its identification upon another's vehicle, the lessee with operating authority vests the owner-lessor with authority that the lessor does not otherwise possess, the authority to transport commodities in interstate commerce. *Id.* Nevertheless, because only a carrier has ICC authority, the carrier is not permitted to delegate it, abrogate it, or evade the responsibilities imposed by it by means of a contractual device; and the responsibility to the public under the leasing device remains, therefore, fixed upon the lessee carrier. *Id.* This fixed responsibility remains during the duration of the lease and until the identification is removed and possession is surrendered back to the lessor. *Id.*

[5] Initially, Congress authorized the Interstate Commerce Commission ("ICC") and the Secretary of Transportation to prescribe regulations with respect to the use of leased vehicles by motor carriers. *Rediehs*, 491 N.E.2d 1010. In 1995, the ICC was abolished. *See* ICC Termination Act of 1995, Pub.L. 104-88 (1995). However, in 2000, the Federal Motor Carrier Safety Administration ("FMCSA") was created as a separate administration of the U.S. Department of Transportation. *See* About FMCSA, http://www.fmcsa.dot.gov/about/aboutus.htm (last visited May 5, 2011). The FMCSA retained many of the regulations promulgated by the ICC, including the regulations regarding motor carrier leases, and the FMCSA is now responsible for promulgating new transportation regulations. *Id. See also* 49 U.S.C. §§ 13301, 14102. The term "ICC number" is, therefore, actually a misnomer and refers to what is now called an "MC number." *See* FMCSA Frequently Asked Questions, http://www.fmcsa.dot.gov/about/ other/faq/faqs.aspx#question5 (last visited May 5, 2011). The terms appear functionally interchangeable, however, as they both refer to an operating authority number obtained by motor carriers engaged in commercial interstate transport from the FMCSA. *Id.*

[6] *See also Cont'l W. Ins. Co. v. Reliance Nat'l Indem. Co.*, 141 F.Supp.2d 968, 970 (N.D.Ind. 2001) (noting the parties' agreement that ICC regulations fixed legal responsibility upon a lessee transportation company with ICC operating authority); *Huber v. Henley*, 669 F.Supp. 1474, 1484 (S.D.Ind. 1987) (noting *Rdiehs*'s statutory liability holding); *McCaslin v. Ins. Co. of the State of Penn.*, 605 N.E.2d 760, 761 (Ind. 1993) (affirming a lower court ruling in which liability was established pursuant to *Rediehs*' theory of statutory liability). *But see Oliver & Iverson v. Honeycutt*, 798 N.E.2d 890 (Ind.App. 2003) (interpreting regulation amendments and concluding, "no longer are courts . . . bound to the determination that if a lease which is entered into meets the requirements of the leasing regulations as established by the Federal Motor Carrier Safety Administration that it is conclusive proof that the

1080; *Guaranty Nat'l Ins. Co.*, 596 N.E.2d at 969; *Rediehs Express Inc.*, 491 N.E.2d at 1011.  In

short, the FMCSA regulations and the corresponding case law make the carrier totally

responsible to the injured plaintiff as a matter of law for the negligence of the . . . drivers of a

leased vehicle.[7]  *Ill. Bulk Carrier, Inc.*, 908 N.E.2d at 255 ("The [FMCSA] regulations promote

public safety by insuring that motor carriers with operating authority are unable to delegate or

evade responsibility by means of a contractual device"); *Rediehs Express Inc.,* 491 N.E.2d at

1012.

   Nevertheless, statutory liability has not been found applicable in all circumstances.

Instead, several Indiana courts have narrowly interpreted the FMCSA regulatory terms, requiring

strict compliance with the regulations before concluding that statutory liability is applicable in a

particular case.  *See e.g. Ill. Bulk Carrier, Inc.*, 908 N.E.2d at 255-56 (holding that statutory

liability was not applicable, wherein the parties sought to be held vicariously liable as

"employees" were corporations rather than "individuals" as the regulations required); *Detrick*,

598 N.E.2d at 1080 (concluding that summary judgment under the ICC lease regulations was

warranted in favor of the Defendant where the plaintiff failed to establish that the Defendant

carrier was operating pursuant to ICC authority); *Guaranty Nat'l Ins. Co.*, 596 N.E.2d at 969

(holding that summary judgment to impose statutory liability was not appropriate wherein the

---

injured driver was an employee of the common carrier. Rather, we are to look to the factors which are traditionally applied by the fact-finder when determining whether an employee-employer relationship exists.").

   [7] Despite the imposition of statutory liability upon lessee carriers owning operating authority, several courts have also recognized the ability of lessee carriers to seek indemnification against the lessors.  *See e.g. Westfield Ins. Co. v. Hanover Ins. Co.*, 9 F.3d 656, 657-58 (7th Cir. 1993); *Huber v. Henley*, 669 F.Supp. 1474, 1484 (S.D.Ind. 1987) (noting that indemnification was still available to the parties despite statutory liability attaching to the lessee carrier with ICC operating authority); *Rediehs Express Inc. v. Maple,* 491 N.E.2d 1006, 1012 (Ind. App. 1986) ("[w]hile as a matter of policy the primary liability to the plaintiff is fixed upon the carrier, the carrier has a right of indemnity against the lessor.").

moving party failed to establish that the vehicle at issue was a permit covered vehicle or subject to a lease agreement).

Carroll argues that High Lean was a motor carrier with operating authority, shipping its hogs pursuant to a valid lease agreement. As such, Carroll contends that *Rediehs* fixes liability for Kamps' alleged negligence upon High Lean as a matter of law. The Court, however, is not persuaded by Carroll's proposed application of the rule established in *Rediehs* to the facts and circumstances of this case. In *Rediehs* and every case cited by this Court that follows *Rediehs*, the applicable FMCSA regulations have been interpreted as imposing statutory liability upon the motor carrier-lessee with the requisite operating authority to engage in commercial interstate transport. *See Ill. Bulk Carrier, Inc.*, 908 N.E.2d at 255; *Detrick v. Midwest Pipe & Steel, Inc.*, 598 N.E.2d 1074, 1080 (Ind. App. 1992); *Guaranty Nat'l Ins. Co.*, 596 N.E.2d at 969; *Rediehs Express Inc. v. Maple*, 491 N.E.2d 1006, 1011 (Ind. App. 1986). As explained in greater detail below, the Court is not persuaded that the rule in *Rediehs* applies to this case because Carroll has failed to submit sufficient evidence to establish: (1) that High Lean is an authorized carrier as defined by the regulations; (2) that High Lean held the requisite operating authority to engage in interstate commercial transport; (3) that High Lean was a lessee of equipment; or (4) that the parties were operating pursuant to a valid lease agreement under the regulations.

To begin, Carroll has failed to submit sufficient evidence to establish that High Lean was an "authorized carrier" as defined by the applicable regulations.[8] The leasing regulations at issue define an authorized carrier as "a person authorized to engage in the transportation of property as a motor carrier under the provisions of 49 U.S.C. [§§] 13901 and 13902." *See* 49 C.F.R. §

---

[8] The applicable definitions are found in the regulations promulgated pursuant to the Transportation Secretary's statutory grant of authority in 49 U.S.C. § 14102.

376.2(a). The regulations further define a motor carrier as "a person providing motor vehicle transportation for compensation." *See* 49 U.S.C. § 13102(15). However, Carroll presents no facts to suggest that High Lean was compensated by T&L or Kamps for transporting its hogs pursuant to the parties' agreement. Rather the facts suggest the opposite, that High Lean paid T&L and Kamps to transport High Lean's hogs. *See e.g* Carroll's brief, DE 52 at 13 ("There is no dispute that T & L was compensated by High Lean for providing High Lean with the use of its trucks and drivers"). As such, even if High Lean provided motor vehicle transportation, as defined by the regulations, High Lean did not do so for compensation in the immediate case. Therefore, High Lean can not be properly considered a motor carrier under 49 U.S.C. § 13102(15) and, as a result, can also not be properly considered an authorized carrier under 49 C.F.R § 376.2(a). Consequently, Carroll has failed to establish that the leasing regulations, regarded under Indiana law as imposing statutory liability upon carriers with operating authority, are applicable in this case. *Compare Ill. Bulk Carrier, Inc.*, 908 N.E.2d at 255-56 (wherein the court narrowly interpreted the FMCSA regulatory definitions and concluded that failure to comport with the same rendered statutory liability inapplicable).

In addition, Carroll has failed to establish that High Lean had the requisite operating authority to engage in commercial interstate transportation. In this regard, Carroll notes that High Lean had a USDOT ("DOT") number, a fact that High Lean does not contest. *See* DE 52-3 at 1; DE 53-3 at 2. However, High Lean asserts that its DOT number was not applicable to the trailer at issue in this case. *See* DE 52-3 at 2. In addition, High Lean asserts that it does not have interstate operating authority in the form of an additional "ICC permitting number." *See* DE 52-3 at 2. Carroll did not file a reply brief in support of its summary judgment motion and,

thereby, failed to present any facts to challenge High Lean's explanations regarding the inapplicability of High Lean's DOT number to the trailer at issue or High Lean's lack of an ICC number.[9]  Because Carroll failed to submit facts or argument to the contrary, the Court considers High Lean's explanation, that it lacked the requisite operating authority to engage in interstate commercial transportation under the statute, to be conceded.  *See also Kochert v. Adagen Med. Intern., Inc.*, 491 F.3d 674, 679 (7th Cir. 2007) ("underdeveloped arguments are waived."); *Boyd v. Owen*, 481 F.3d 520, 524-25 (7th Cir. 2007).  Consequently, for this reason as well, Carroll has failed to submit sufficient evidence to establish that High Lean was an authorized carrier under the applicable leasing regulations.[10]

---

[9] Based upon the parties' minimal filings, it is difficult to conclusively determine whether the ICC/MC number that conveyed operating authority for interstate commerce has since been replaced with a DOT number under the applicable regulations.  *See e.g.* 49 C.F.R. §§ 376.11(c)(1); 390.21(b)(2); 390.21(b)(5)(i).  However, the Court notes that, according to the FMCSA's own website, interstate commercial motor carriers are still advised to apply for an MC number in addition to a DOT number.  *See e.g.* FMCSA Frequently Asked Questions, http://www.fmcsa.dot.gov/about/other/faq/faqs.aspx#question5 (last visited May 5, 2011).  In addition, also suggesting that both numbers are required for authorization to engage in interstate commercial transport, the Court notes that the parties' contract characterizes T&L as an "authorized carrier of property" and identifies "MC 408888" as T&L's operating authority number.  *See* DE 50-1 at 2.  *See also* DE 24 at 2 (T&L is also identified as having DOT number 955480).

[10] Further, even assuming that High Lean is properly considered an authorized carrier and that the parties were acting pursuant to a valid lease (another conclusion that the Court does not consider established), the Court still questions the applicability of *Rediehs* and its progeny to the immediate case, given High Lean's status as a lessor of equipment.  While the status of lessor and lessee does not appear to be a critical factor for imposing statutory liability in every case, the Court notes that in *Rediehs* and other Indiana cases like it, in which statutory liability was fixed upon the carrier with operating authority, the liable carrier was the lessee of equipment rather than the lessor.  *See e.g. Cont'l W. Ins. Co.*, 141 F.Supp.2d at 969-70; *McCaslin*, 605 N.E.2d at 761 ("a *lessee* operating under an ICC permit is liable when the truck involved is operating under their ICC permit number") (emphasis added); *Rediehs Express Inc. v. Maple*, 491 N.E.2d 1006, 1011 (Ind. App. 1986).  *See also Huber*, 669 F.Supp. at 1484 ("the law fixes responsibility to the public on the *lessee* operating under an ICC permit") (emphasis added).
    The applicable regulations define a lessor as "the party granting the use of equipment . . . to another" and a lessee as "the party acquiring the use of equipment . . . from another." *See* 49 C.F.R. §§ 376.2(f) and (g).  The express terms of the parties' contract clearly establish that High Lean granted T&L the use of its trailer for transportation of High Lean's hogs.  *See* DE 50-1 at 2 ("[High Lean] agrees to offer for shipment and [T&L] agrees to transport by motor vehicle . . . various quantities of live swine."); DE 50-1 at 3 ("[T&L] agrees to haul only [High Lean's] swine with [High Lean's] trailers").  *See also* DE 50-1 at 2 (provision notes that liability under the agreement will be fixed upon T&L "at the time cargo is loaded upon [High Lean's] equipment").  In contrast, nowhere in the parties' contract does T&L grant High Lean the use of T&L's equipment of Kamps' tractor.  As such, despite Carroll's strained interpretation to the contrary, the facts of this case suggest that (assuming the parties' agreement is properly characterized as a lease) T&L would be considered the lessee and High Lean would be

As a result, Carroll has failed to establish that High Lean should be held statutorily liable under *Rediehs* and the applicable leasing regulations. *Compare Detrick*, 598 N.E.2d at 1080 (concluding that summary judgment under the [FMCSA] lease regulations was warranted in favor of the Defendant where the plaintiff failed to establish that the Defendant carrier was operating pursuant to [FMCSA] authority). *See also Rediehs Express Inc.*, 491 N.E.2d at 1011 ("[l]iability is fixed as a matter of policy upon the *carrier owning operating authority* in lease situations in order to enforce [FMCSA] regulations") (emphasis added).

Finally, Carroll has also failed to submit sufficient evidence to establish that the parties were acting pursuant to a valid lease under the regulations, making the application of *Rediehs* even more attenuated to the facts of this case. *See e.g. Guaranty Nat'l Ins. Co.*, 596 N.E.2d at 969 (holding that summary judgment regarding statutory liability was not appropriate wherein the moving party failed to establish that the vehicle at issue was a permit covered vehicle or subject to a lease agreement).

The applicable leasing regulations specify that a carrier holding operating authority may perform authorized transportation in equipment it does not own only under certain conditions. 49 C.F.R. § 376.11. *Ill. Bulk Carrier, Inc.*, 908 N.E.2d at 255; *Rediehs Express Inc.*, 491 N.E.2d at 1010. Primarily, this requires the parties to execute a written lease that comports with the additional requirements of the regulations. 49 C.F.R. § 376.11(a); 49 U.S.C. § 14102. *See also Ill. Bulk Carrier, Inc.*, 908 N.E.2d at 259 ("[u]nder the [FMCSA regulations], a lease involves the possession, control, and use by one carrier of equipment owned by another"); *Rediehs Express Inc.*, 491 N.E.2d at 1010. For instance, the regulations require that the terms of the lease

considered the lessor, and not the other way around.

specify the duration of the lease, the compensation arrangement, and the insurance obligations of the parties. 49 C.F.R. §§ 376.12(b), (d), (j). *See also Rediehs Express Inc.*, 491 N.E.2d at 1010. Further, the lease must provide that the authorized carrier lessee shall have "exclusive possession, control and use of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1). *See also Ill. Bulk Carrier, Inc.*, 908 N.E.2d at 255; *Rediehs Express Inc.*, 491 N.E.2d at 1010.

In addition to the requirements regarding the terms of a valid lease, the regulations also mandate that the parties exchange receipts, noting the dates in which possession of the lease vehicle was obtained and surrendered. 49 C.F.R. § 376.11(b). *See also Rediehs Express Inc.*, 491 N.E.2d at 1010. The regulations also require that the lessee-carrier maintain detailed records regarding every trip made while in possession of the leased vehicle. 49 C.F.R. § 376.11(d). Finally, the lessee-carrier is required to identify the leased equipment in accordance with the regulations. *See* 49 C.F.R. §§ 376.11(c)(1); 390.21(b)(2); 390.21(5)(i). *See also Rediehs Express Inc.*, 491 N.E.2d at 1010-11.

Similar to a valid lease under the regulations, the parties' contract does specify a duration, a compensation agreement, and the insurance obligations of the parties. *See e.g* DE 50-1 at 3 ("[t]he Agreement shall remain in effect for a period of one (1) year from this date, and from year to year thereafter"); DE 50-1 at 2 ("[r]ates and charges for swine moved under this Agreement shall be agreed to between the parties hereto in writing and are to be contained in the Attached Exhibit B"); DE 50-1 at 2 (outlining the applicable insurance policies, coverage amounts, and named beneficiaries). In addition, the contract also requires T&L to maintain detailed records regarding the trips made with the trailer, in the form of a weekly freight bill.

*See* DE 50-1 at 2.

However, unlike a valid lease, there is no provision under the parties' agreement granting T&L exclusive possession, control and use of the equipment, contrary to the requirements of the regulations. *See generally* DE 50-1. In addition, as discussed in more detail below as part of the Court's analysis of High Lean's motion for summary judgment, the undisputed facts suggest that High Lean retained a significant amount of control over the trailer under the contract terms. In particular, the Court notes that T&L was only permitted to use the contracted-trailer for transport of High Lean's hogs, to and from locations determined by High Lean. *See* DE 50-1 at 2 ("Swine shall be picked up at point of origin by [T&L] and be delivered at point of destination at the time specified by [High Lean]"); DE 50-1 at 3 ("[T&L] agrees to haul only [High Lean's] swine with [High Lean's] trailers."). Further, T&L was not at liberty to subcontract or assign its shipment duties without High Lean's permission. *See* DE 50-1 at 3. As such, not only did the contract fail to provide T&L with exclusive control of High Lean's trailer as one of its express terms, the contract, instead, specified that High Lean retained a significant amount of control regarding the trailer's use throughout the parties' contractual relationship. As such, the undisputed facts establish that the parties' contract significantly deviates in regards to a required provision of a valid lease under the regulations. *See* 49 C.F.R. § 376.12(c)(1). *See also Ill. Bulk Carrier, Inc.*, 908 N.E.2d at 259 ("[u]nder the [FMCSA regulations], a lease involves the possession, control, and use by one carrier of equipment owned by another"); *Rediehs Express Inc.*, 491 N.E.2d at 1010.

Further, in another deviation from the requirements of a valid lease under the applicable regulations, the contract does not establish that the parties were to exchange receipts regarding

the use of the trailer and Carroll did not present any evidence to suggest that they did, indeed, exchange receipts as required. In addition, Carroll failed to submit any evidence to establish that the parties properly identified the vehicles as required by the lease regulations.

Given these marked deviations from the requirements set forth in 49 C.F.R. § 376.11 and 49 C.F.R. § 376.12, the Court concludes that Carroll has failed to submit sufficient evidence to establish, as a matter of law, that the parties were operating pursuant to a valid lease agreement under the regulations. More than one Indiana court has found that such failure is sufficient to prevent the imposition of statutory liability under *Rediehs* and the leasing regulations. *See e.g. Ill. Bulk Carrier, Inc.*, 908 N.E.2d at 255-56 (narrowly interpreting the regulatory definitions and finding statutory liability to be inapplicable, wherein the parties sought to be held vicariously liable did not strictly meet the statutory definition of "employees"); *Detrick*, 598 N.E.2d at 1080 (concluding that the parties were not operating pursuant to a lease agreement under the regulation and that *Rediehs* was, therefore, inapplicable, wherein the Plaintiff failed to establish that the Defendant possessed [FMCSA] operating authority); *Guaranty Nat'l Ins. Co.*, 596 N.E.2d at 969 (holding that summary judgment to impose statutory liability under *Rediehs* was not appropriate, wherein the moving party failed to establish that the vehicle at issue was a [FMCSA] permit-covered vehicle or subject to a lease agreement).

Indeed, it appears that even Carroll acknowledges that the parties' agreement does not comport with the regulations' requirements for a valid lease. *See e.g.* DE 52 at 13-15. Instead, in what appears to be somewhat of a last-ditch effort to impose statutory liability upon High Lean, Carroll asserts that the Court should rely upon the policies behind the regulations "to infer the existence of a statutory employer relationship" and, thereby, prevent High Lean from

"escaping" statutory liability by failing to enter into a valid lease agreement. *Id.*

However, this argument is unavailing given that several Indiana courts have shown little reluctance to deny statutory liability, wherein the moving party failed to establish either that the parties were acting pursuant to a valid lease agreement or that the party sought to be held statutorily liable held the requisite operating authority to engage in interstate commercial transport. *Id.* In this regard, it is notable that Carroll cites no Indiana case in which the Court overlooked a movant's failure to submit sufficient evidence to factually establish either the existence of a valid lease or the requisite operating authority and, nevertheless, found statutory vicarious liability to be applicable. Further, none of the out-of-state cases cited by Carroll to support his argument for a policy-based inference of statutory liability, support such an inference in a factual situation comparable to this case. *See e.g. Stewart v. Four Seasons Coach Leasing*, 2004 WL 2526415 (Cal. Ct. App. 2004) (unpublished opinion); *Harris v. Mitchell*, 818 A.2d 443 (N. J. Super. Ct. App. Div. 2003); *Toomer v. United Resin Adhesives, Inc.*, 652 F.Supp. 219, 228-29 (N.D.Ill. 1986). As such, the Court is not persuaded that the policy behind the regulations requires the Court to overlook Carroll's failure to present sufficient facts to establish that High Lean was an authorized carrier with FMCSA operating authority or that the parties were operating pursuant to a valid lease and impose statutory liability in this case.

In sum, Carroll has failed to present sufficient facts to establish that High Lean was an authorized carrier as defined by the applicable regulations, that High Lean possessed the requisite operating authority to engage in interstate commercial transport, or that the parties had entered into a validly constructed lease under the regulations. Any one of these deficiencies is sufficient to prevent the application of statutory liability under *Rediehs* and the leasing

regulations. Consequently, the Court now **DENIES** Carroll's motion for summary judgment. [DE 51].

## C. Analysis of High Lean's Motion for Summary Judgment [DE 51].

In its motion for summary judgment, High Lean asserts, under a common law theory of vicarious liability, that Kamps was not serving High Lean as an employee but rather as an independent contractor. Relying solely on its theory of statutory liability, Carroll chose not to substantively respond to High Lean's common law argument or analysis.

Whether one employed to perform a task acts as an independent contractor or a servant is generally a question of fact. *Progressive N. Ins. Co. v. Movemeant Sales, Inc.*, 2009 WL 3200804 at *2 (N.D.Ind. 2009); *Guillaume v. Hall Farms, Inc.*, 914 N.E.2d 784, 788 (Ind. App. 2009); *In re FedEx Ground Package System Inc., Emp't Practices Litig.*, 2008 WL 7764456 at *56 (N.D. Ind. 2008) (hereinafter "*FedEx*"); *Carter v. Prop. Owners Ins. Co.*, 846 N.E.2d 712, 717 (Ind. App. 2006); *Detrick*, 598 N.E.2d at 1077-78 (holding that disputed issues of fact precluded summary judgment on the issue of determining employee versus independent contractor status); *Guaranty Nat'l Ins. Co.*, 596 N.E.2d at 969 (holding that summary judgment on this issue was inappropriate wherein the moving party had failed to establish that the relevant facts were not uncontested); *Dallas Moser Transporters, Inc.*, 594 N.E.2d at 457. However, where the relevant facts are undisputed, the court will determine whether the employer has the right to control the alleged employee.[11] *Progressive N. Ins. Co.*, 2009 WL 3200804 at *2; *Guillaume*, 914 N.E.2d at 788; *Carter*, 846 N.E.2d at 717; *Detrick*, 598 N.E.2d at 1077.

---

[11] In at least one Indiana case, a court has withheld entry of summary judgment regarding employment status, wherein the court determined that the evidence regarding the extent of control maintained by the principle was conflicted and wherein the remaining *Moberly* factors were evenly split. *See Carter*, 846 N.E.2d at 719, 722.

The parties submitted very few facts and attached scant exhibits in support of their respective motions. However, the minimal facts presented are almost entirely undisputed. As previously noted, Carroll did not respond to High Lean's interpretation of the facts relative to High Lean's common law analysis of employment status. Under such circumstances, the Court would not be unjustified in considering Carroll's silence, in this regard, as conceding High Lean's interpretation of the facts. *See e.g. Dallas Moser Transporters, Inc. v. Ensign*, 594 N.E.2d 454, 457 (Ind. App. 1992) (noting that a non-movant plaintiff must offer some evidence to support the inference that the Defendant was the employee of the Defendant rather than an independent contractor). *See also Guillaume v. Hall Farms, Inc.*, 914 N.E.2d 784, 791 (Ind. App. 2009) (concluding facts not in dispute wherein the non-moving party failed to submit evidence to create questions of fact). Nevertheless, the Court believes it appropriate to conduct a full analysis, considering all the facts submitted in the parties' briefs and attached exhibits, including the parties' contract for transportation of High Lean's hogs.[12]

### 1. Moberly factors

Indiana has adopted a ten-factor test to distinguish employees from independent contractors, which include each of the following:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

---

[12] When a formal contract exists, as in the immediate case, the right of control and other relevant factors pertaining to employment status can often be best determined by the contract's terms. *FedEx*, 2008 WL 7764456 at *57; *Progressive N. Ins. Co.*, 2009 WL 3200804 at *11. *See also* 50-1.

(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(I) whether or not the parties believe they are creating the relation of master and servant;
(j) whether the principal is or is not in business.

*Progressive N. Ins. Co.*, 2009 WL 3200804 at *5; *Guillaume*, 914 N.E.2d at 788; *FedEx*, 2008 WL 7764456 at **56-57; *Carter*, 846 N.E.2d at 717-18; *Detrick*, 598 N.E.2d at 1077; *Moberly v. Day*, 757 N.E.2d 1007, 1010 (Ind. 2001). While no single factor is dispositive, the right to control is the most important factor and is given the greatest weight in determining employment status. *Progressive N. Ins. Co.*, 2009 WL 3200804 at *2; *FedEx*, 2008 WL 7764456 at *57.

### 2. Evaluation of Moberly factors

#### a. Extent of control over details of the work

An employee is one employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control. *Guillaume*, 914 N.E.2d at 789; *Carter*, 846 N.E.2d at 718; *Moberly*, 757 N.E.2d at 1010 (Ind. 2001). In contrast, an independent contractor controls the method and details of his task and is answerable to the principal as to results only. *Guillaume*, 914 N.E.2d at 789; *Detrick v. Midwest Pipe & Steel, Inc.*, 598 N.E.2d at 1077; *Dallas Moser Transporters, Inc.*, 594 N.E.2d at 457. As such, where the evidence indicates that an individual is answerable to another for results only and not the particulars of how an assigned task is accomplished, the factor weighs in favor of independent contractor status. *Progressive N. Ins. Co.*, 2009 WL 3200804 at *6; *Moberly*, 757 N.E.2d at 1011.

In the immediate case, the parties' contract reveals that High Lean was permitted to exercise a significant level of control over T&L and Kamps in regards to the locations and times

for every one of the deliveries made pursuant to the contract. *See* DE 50-1 at 2. However, the Court notes that several courts have held that setting a work schedule or requiring an individual to be at a given place at a given time are not, by themselves, sufficient to establish an employer-employee relationship. *Progressive N. Ins. Co.*, 2009 WL 3200804 at *6 ("[i]nstead of focusing on when and where the [individuals] worked . . . , the important question is whether the details of the work they did . . . were controlled by [the principal]"). *See also Snell v. C.J. Jenkins Enters., Inc.*, 881 N.E.2d 1088, 1092 (Ind. App. 2008) (holding that assigning a delivery area and deadlines for newspaper deliveries was insufficient, by itself, to establish requisite control for an employer-employee relationship).

In addition, the contract required T&L and Kamps to provide a weekly freight bill to High Lean, identifying the pick up and delivery points, the number of hogs shipped, and the status of the hogs delivered. *See* DE 50-1 at 2. Further, under the contract's terms, T&L and Kamps were only permitted to make shipments of High Lean's hogs in High Lean's trailer and were not permitted to subcontract the work without High Lean's permission. *See* DE 50-1 at 3. The contract also required that daily maintenance logs regarding High Lean's trailer be provided to High Lean at its "wash barn." *See* DE 50-1 at 3. Additionally, the contract required that T&L obtain a number of insurance policies to cover High Lean's trailer, its hogs, and any liability suits occurring during shipment. *See* DE 50-1 at 2. Under the contract, High Lean was the beneficiary of a variety of different insurance policies in contractually-mandated coverage amounts; and T&L was required to further indemnify High Lean for any liability suits arising under the contract. *See* DE 50-1 at 2-3. Finally, the contract required that Kamps and other T&L drivers enroll in a specified quality control class. *See* DE 50-1 at 3.

Considering these facts, it appears that High Lean maintained control over a number of the particulars regarding how shipment of its hogs was made pursuant to the contract with T&L, and that Kamps was not merely responsible to High Lean for results only. However, the Court notes that the facts do not establish that High Lean had authority to control critical elements relating to the manner or the "how" of shipments. For instance, the contract is silent regarding the routes taken or the actual operation of Kamps tractor during shipment. As such, the Court concludes that this factor is neutral in the Court's evaluation.

b.  Occupation or business of one employed

This factor examines whether or not the one employed is engaging in a distinct occupation or business. *Progressive N. Ins. Co.*, 2009 WL 3200804 at *8; *Guillaume*, 914 N.E.2d at 789; *Carter*, 846 N.E.2d at 719 (noting that "more general, less distinct, occupations" are more indicative of employee status). The facts are undisputed that Kamps was a truck driver operating pursuant to a commercial drivers license. *See* DE 52-1. It also appears undisputed that Kamps did not drive exclusively for High Lean. *See* DE 50 at 6. At least one Indiana court has concluded that a truck diver is a distinct enough occupation to "weigh at least slightly in favor of independent contractor status." *Moberly*, 757 N.E.2d at 1011. As such, the Court concludes, consistent with *Moberly*, that this factor tilts slightly towards independent contractor status.

c.  Kind of occupation

This factor examines whether the work is generally done under the direction of an employer or by a specialist without supervision. *Progressive N. Ins. Co.*, 2009 WL 3200804 at *8; *Guillaume*, 914 N.E.2d at 789; *Carter*, 846 N.E.2d at 720. The parties did not submit evidence regarding the level of direction typically implicated in the commercial trucking

business.  However, because commercial truck drivers are required to have a commercial drivers

license and spend hours alone driving to and from delivery sites, it appears that commercial truck

transport is generally performed by a specialist without supervision.  As such, this factor tilts

slightly towards independent contractor status.

> d.  Skill required

If a special skill is involved in completing the assigned tasks, this factor weighs in favor

of independent contractor status. *Progressive N. Ins. Co.*, 2009 WL 3200804 at *8 ("[u]nskilled

labor is typically performed by employees while skilled labor is often performed by independent

contractors"); *Moberly*, 757 N.E.2d at 1011.  The facts are uncontested that Kamps drove

commercial trucks pursuant to a commercial drivers license.  *See* DE 52-1 at 3.  At least one

court has found that a specialized license was an indicia of a specialized skill.  *Guillaume*, 914

N.E.2d at 790.  Consequently, the Court concludes that this factor also tilts towards independent

contractor status.

> e.  Instrumentalities - supplier of equipment, tools, and work location

When a principal provides the instrumentalities of employment, particularly

instrumentalities of substantial value, this factor tilts towards employee status.  *See Moberly*, 757

N.E.2d at 1012 (citing Restatement (Second) of Agency § 220(2), comment k).  At the time of

the accident, Kamps was operating his own tractor but was pulling High Lean's trailer.  *See* DE

52-1.  Under the parties' contract, T&L and Kamps were only permitted to transport High Lean's

hogs in High Lean's trailer.  *See* DE 50-1 at 3.  Further, the contract required Kamps, as one of

T&L's drivers, to provide a daily maintenance log regarding the trailer to High Lean.  *See* DE

50-1 at 3.  As such, although Kamps provided his own tractor, High Lean also supplied

equipment of substantial value to the endeavor, in the form of its trailer. Consequently, the Court concludes that this factor is neutral.

### f. Length of employment

While a longer-term relationship can suggest employee status, such a relationship must also involve regular and continuous hours to tilt this factor conclusively towards employee status. *Progressive N. Ins. Co.*, 2009 WL 3200804 at *10; *Carter*, 846 N.E.2d at 721; *Moberly*, 757 N.E.2d at 1012. In the immediate case, the parties' contract discloses that they had a one-year, automatically renewing business relationship. *See* DE 50-1 at 3. However, the contract is silent regarding Kamps' hourly commitment or schedule. Similarly, the contract does not disclose how frequently Kamps made deliveries on High Lean's behalf. As such, the Court can not determine, from the minimal facts before the Court, whether Kamps worked regular and continuous hours. As a result, the Court concludes that this factor is neutral in the Court's evaluation.

### g. Method of payment

Payment by the hour or month, as opposed to the job, is evidence of a traditional employment relationship. *Progressive N. Ins. Co.*, 2009 WL 3200804 at *10; *Guillaume*, 914 N.E.2d at 790; *Carter*, 846 N.E.2d at 721; *Moberly*, 757 N.E.2d at 1012. Here, the parties' contract specifies that payment was to be made pursuant to each shipment of hogs. *See* DE 50-1 at 2. Specifically, the contract required T&L to submit invoices for completed delivery orders and that High Lean would make payment to T&L within ten days, thereafter, according to rates agreed upon by the parties. *See* DE 50-1 at 2. Consequently, because the contract specifies that payment was made by the job rather than in terms of a salary or hourly rate, the Court concludes

23

that this factor suggests independent contractor status.

### h. Regular business of the employer

This factor considers whether or not the work at issue is part of the regular business of the employer. *Guillaume*, 914 N.E.2d at 790; *Moberly*, 757 N.E.2d at 1012 (noting that activities done periodically are not considered part of the employer's regular business). High Lean was primarily in the business of raising hogs and selling pork products. *See* DE 53-2. High Lean asserts that it was not engaged in the trucking or transportation business. *See* DE 53-2; DE 53-3. While the facts reveal that High Lean owned at least one of its own trailers; High Lean contracted with commercial carriers such as T&L to ship its hogs in its own trailers. That High Lean provided a trailer and specified the pick-up and delivery locations and times of every shipment made by T&L, *see* DE 50-1, suggests to the Court High Lean's intention to safeguard and protect its product, perhaps from disease or other injury, not engage in transportation. Commercial transportation does not appear to be the function of High Lean's business. As such, the Court concludes that this factor weighs in favor of independent contractor status.

### i. Belief of the parties

Although the parties' beliefs are not determinative of master-servant relationships, they are relevant insofar as they indicate one party's assumption of control and the other party's submission to that control. *Progressive N. Ins. Co.*, 2009 WL 3200804 at *11; *Guillaume*, 914 N.E.2d at 790; *Carter*, 846 N.E.2d at 721; *Moberly*, 757 N.E.2d at 1012-13. Further, an employer-employee relationship can exist, despite the parties' characterization of their relationship as that of a principal-independent contractor, "where sufficient indicia of a master-servant relationship exists." *Dallas Moser Transporters, Inc.*, 594 N.E.2d at 457. In the

immediate case, the parties' contract clearly states, "[t]he relationship of [T&L] to [High Lean] shall, at all times be that of an independent contractor." *See* DE 50-1 at 3. In addition, the owner of High Lean, Harley Sietsema, affirms that he believed Kamps to be an independent contractor and not an employee of High Lean. *See* DE 53-2 at 2. Notably, Carroll has submitted no evidence to rebut this understanding. In the absence of evidence to the contrary, the Court, therefore, concludes that this factor leans in favor of independent contractor status.

> j. Whether the principal is in business

Finally, when the principal is in business, this factor tilts towards employee status. *Progressive N. Ins. Co.*, 2009 WL 3200804 at *11; *Guillaume*, 914 N.E.2d at 790-91; *Carter*, 846 N.E.2d at 721; *Moberly*, 757 N.E.2d at 1013. High Lean concedes that it is in business and that this factor tips in favor of employment status.

> ### 3. *Moberly factors suggest independent contractor status*

All together, one of the ten *Moberly* factors, weigh in favor of employment status. However, the other nine factors suggest independent contractor status or are otherwise neutral in the Court's evaluation. As such, while not all the factors suggest independent contractor status, a clear majority of the factors suggest such status. Therefore, based upon the undisputed facts, the Court concludes, as a matter of law, that Kamps was acting as an independent contractor for High Lean rather than as High Lean's employee. Consequently, the Court considers summary judgment in favor of High Lean to be appropriate and **GRANTS** High Lean's motion for summary judgment. [DE 50].

## III. Conclusion

For the aforementioned reasons, this Court now **DENIES** Carroll's motion for summary

judgment. [DE 51]. Instead, the Court now **GRANTS** High Lean's motion for summary

judgment. [DE 50]. Accordingly, the Clerk is **INSTRUCTED** to term High Lean from this

case. Because the parties' cross motions for summary judgment were silent in regards to

Carroll's claims against T&L and ACN, however, those claims remain pending before the Court.


     SO ORDERED.

     ENTERED:   June 13, 2011

                   /s/ JON E. DEGUILIO
                   Judge
                   United States District Court